E-FILED; Montgomery Circuit Court
Docket: 6/15/2022 11:02 AM; Submission: 6/15/2022 11:02 AM

| | |
|---|---|
| TIFFANY JOHNSON<br>1101 Cavendish Dr.<br>Colesville, MD 20905, on behalf of herself<br>and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>CONTINENTAL FINANCE COMPANY,<br>LLC<br>4550 New Linden Hill Road, Suite 400<br>Wilmington, DE 19808<br>Serve on:<br>Lamiaa E. Elfar<br>4550 New Linden Hill Road, Suite 400<br>Wilmington, DE 19808<br><br>and<br><br>CONTINENTAL PURCHASING, LLC<br>4550 New Linden Hill Road, Suite 400<br>Wilmington, DE 19808<br>Serve on:<br>Continental Finance Company, LLC<br>4550 New Linden Hill Road, 4th Floor<br>Wilmington, DE 19808<br><br>     Defendants. | IN THE CIRCUIT COURT<br><br>FOR MONTGOMERY COUNTY<br><br><br>Case No. _____<br><br><br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1.     Plaintiff, Tiffany Johnson, brings this action to challenge abusive and unlawful high-interest consumer loan origination and collection practices.

2.     The affiliated Defendants Continental Finance Company, LLC ("CFC") and its wholly owned subsidiary Continental Purchasing, LLC ("CP") (CFC and CP are collectively, "Continental") are predatory high-interest small-loan lenders, who originate credit by marketing, making, servicing, and collecting on consumer credit card loans in violation of Maryland law.

3.     Continental regularly offers and extends consumer credit to Marylanders including Plaintiff Johnson. Although Continental is domiciled outside of Maryland, the

applications for the loans for the Maryland-resident Plaintiff and Class Members originated in Maryland and Plaintiff and Class Members accepted and used the credit cards associated with the loans in Maryland.

4.     Continental attempted to evade Maryland law by arranging for a third-party financial institution to issue the credit cards for Plaintiff and others, even though Continental marketed the loan accounts, underwrote the loan accounts, collected all payments on the loan accounts, and always bore all of the risk of the credit transactions – but Maryland's Legislature and Court of Appeals have seen through and prohibited such schemes.

5.     In particular, Maryland law requires persons who arrange and collect on loans, like Continental, to be licensed.

6.     This is no secret. In *CashCall, Inc. v. Maryland Com'r of Fin. Regulation*, 448 Md. 412, 439 (2016) ("*CashCall*"), the Maryland Court of Appeals confirmed that the longstanding terms of the Maryland Credit Services Businesses Act, Md. Code Ann., Com. Law §§ 14-1901 *et seq.* (the "MCSBA") apply to persons utilizing a scheme like Continental. *CashCall* addressed a lending setup virtually identical to Continental's and explained why Maryland law required a loan broker like Continental to be licensed. *CashCall* also held that a person arranging and then collecting on loans, like Continental has done here, is the *de facto* lender in the transaction.

7.     As a result, at least two Maryland statutes require Continental to be licensed – the Maryland Credit Services Businesses Act, Md. Code Ann., Com. Law §§ 14-1901 *et seq.* (the "MCSBA") and the Maryland Consumer Loan Law, Md. Code Ann., Com. Law §§ 12-301 *et seq.* (the "MCLL").

8.     The MCSBA regulates all "credit services businesses" who, like Continental, are paid for arranging extensions of credit by others. *See* MCSBA § 14-1901; *see also CashCall*.  In

2

Plaintiff and Class Members' transactions, Continental, with respect to an extension of credit by a third-party financial institution, provided, performed, or represented that it could or would sell, provide, or perform, the service of obtaining an extension of credit for the consumer Plaintiff and Class Members.

9.        Continental offered or agreed to sell, provide, or perform services to Plaintiff and Class Members, who are all residents of this State. In addition, Continental makes written solicitations or communications that are received in Maryland, by Maryland residents. Accordingly, the MCSBA requires Continental, like all credit services businesses providing services to Marylanders, to be licensed. *See* MCSBA § 14-1903.

10.       Continental does not have the license prescribed by, and required by, the MCSBA.

11.       Because Continental arranged loans for Plaintiff and Class Members without a license, under purported contracts with Plaintiff and Class Members which did not contain the disclosures and terms required by the MCSBA, the contracts are void and unenforceable as contrary to the public policy of Maryland. *See, e.g.,* MCSBA § 14-1907.

12.       That is not all. Continental was the *de facto* lender in Plaintiff and Class Members' transactions, all of which are subject to the MCLL – and so Continental was also required to be licensed under the MCLL. It was not. As a result, the loans to Plaintiff and Class Members are void and unenforceable, and Continental cannot receive or retain any payments on those loans.

13.       In particular, Continental received, through contracts with the third-party financial institutions extending the credit to Plaintiff and Class Members, the exclusive right to collect all payments of principal, interest and fees from Plaintiff and Class Members, including setup and maintenance fees which were assessed before Plaintiff and Class Members used their

credit cards. As a result, Continental was the *de facto* lender in Plaintiff and Class Members'
transactions. *See CashCall*, 448 Md. at 436 (where a credit services business "received, through
contracts with the banks, the exclusive right to collect all payments of principal, interest and fees,
including the origination fee…[t]his arrangement, in essence, rendered CashCall [the credit
services business] the *de facto* lender."). Continental extended credit to Plaintiff and each Class
Member and made the loans to Plaintiff and each Class Member.

      14.    The MCLL regulates all loans under $25,000 that do not qualify for the limited
exceptions to the application of the statute. *See* MCLL § 12-303. All of Continental's loans to
Plaintiff and Class Members were for less than $25,000 and none of the loans to Plaintiff and
Class Members qualify for any of the limited exceptions to the application of the MCLL.

      15.    Continental has made numerous loans to Maryland residents, loans which are
regulated by the MCLL, in each of the last three years and for many years prior to that. It is
engaged in the business of making loans regulated by the MCLL.

      16.    The MCLL prohibits making loans within its auspices without a license. *See*
MCLL § 12-314(a) ("A person may not lend $25,000 or less if … [t]he person is not licensed
under or exempt from the licensing requirements under the Maryland Consumer Loan Law--
Licensing Provisions.").

      17.    Because Continental made loans subject to the MCLL to Plaintiff and Class
Members without a license, those loans are "void and unenforceable." *See* MCLL § 12-314(b) ("A
loan made in the amount of $25,000 or less, regardless of whether the loan is or purports to be
made under this subtitle, is void and unenforceable if…[a] person who is not licensed under or
exempt from the licensing requirements under Title 11, Subtitle 2 of the Financial Institutions
Article made the loan.").

18.     And Continental may not "receive or retain" any amounts from Plaintiff or Class Members in connection with its void and unenforceable loans to them. *See* MCLL § 12-314(b)(2) ("A person may not receive or retain any principal, interest, fees, or other compensation with respect to any loan that is void and unenforceable under this subsection.").

19.     Accordingly, Maryland law prohibits Continental from collecting any amounts on its loans to Plaintiff and Class Members.

20.     Nevertheless, Continental unlawfully collected and retained money from Plaintiff and Class Members on their loan accounts, in violation of Maryland law.

21.     Maryland's Legislature has imposed harsh consequences for non-bank lenders – like Continental – who partner with a bank or other federally insured third-party financial institution in order to avoid state interest-rate caps, but do not comply with other applicable Maryland laws. The Maryland Court of Appeals has characterized similar arrangements as "rent-a-bank" schemes. *See CashCall,* 448 Md. at 420 (2016).

22.     Yet Continental repeatedly flouted and disregarded applicable Maryland law and arranged and collected on consumer loans from Plaintiff and each Class Member in return for substantial compensation, without a Maryland license, frustrating the protections enacted by the General Assembly, evading regulatory oversight, damaging Plaintiff and Class Members, and obtaining an unfair advantage over its licensed and regulated competitors in the process.

23.     As a result of the facts alleged in this Complaint, Plaintiff and each Class Member are entitled to a declaration that Maryland law requires Continental to be licensed, that the contracts for Continental's services are void and unenforceable, that the Plaintiff and Class Members' Continental loan accounts are void and unenforceable, and that Continental was

never entitled to collect any amounts from Class Representative and Class Members, under

Maryland's Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. §§ 3-401 *et seq*.

24.     In addition, Continental must return all payments made to it by Plaintiff and

Class Members within the past twelve years, under the MCLL.

25.     Because Defendants' activities were form-driven and violate the law in materially

uniform ways in the transactions of the Plaintiff and the numerous others, this lawsuit is well-

suited for class action treatment.

26.     Accordingly, Plaintiff requests certification of the following Class:

> All Maryland residents who obtained loans in the amount of $25,000 or less, where
> the loan application originated in Maryland and where Continental received,
> through agreements with a third-party financial institution, the exclusive right to
> collect all payments of principal, interest and fees on the loan.

27.     Excluded from the Class are all employees or representatives of Continental, all

Court personnel, and all persons where the loan at issue was originated more than 12 years ago

and no payments have been made on the account within the last 12 years.

### Parties

28.     Plaintiff is a natural person who is a resident and citizen of the State of Maryland,

and who was a resident of the State of Maryland and within the state of Maryland at the time she

entered into any agreement with Continental.

29.     Continental Finance Company, LLC is a privately-held subprime credit card loan

originator, marketer, and servicer. It is a limited liability company organized in Delaware, with

its principal place of business in Delaware. CFC markets, underwrites and services credit card

accounts in Maryland and elsewhere in the United States.

30.     Continental Purchasing, LLC is a wholly-owned subsidiary of Continental

Finance Company, LLC. Under receivables purchase agreements, Continental Purchasing, LLC

agreed in advance of the origination of Plaintiff's and Class Members' accounts to purchase all of the rights, title, and interest in the receivables of Plaintiff's and Class Members' accounts promptly after origination, and did so.

## Jurisdiction and Venue

31.     This Court has subject-matter jurisdiction over this case pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 1-501 and 4-402(e)(2).  This Court has personal jurisdiction pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and 6-103(b), as each of the Defendants transacts business and performs work and service in the State of Maryland, contracts to supply services in the State of Maryland, and regularly does and solicits business and engages in other persistent courses of conduct in the State of Maryland, including the business described in this Complaint.

32.     Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. §§ 4-402(e)(2) and 6-201, as the amount in controversy in this case exceeds $15,000.00 and because each of the Defendants carries on a regular business and habitually engages in vocation in Montgomery County, Maryland. Among other things, each Defendant directs its activity described in this Complaint to persons including residents of Montgomery County, Maryland.

## Factual Allegations for Individual and Class Relief

### Continental's Business

33.     Continental marketed, originated, serviced, and collected on Plaintiff and Class Members' credit card loan products, and extended credit to Plaintiff and Class Members, all in exchange for compensation, but Continental has no license to do so under Maryland law.

34.     Continental is a small-loan lender. Credit limits on its accounts are all less than $6,000. Continental targets subprime customers and engages in predatory lending designed to lure borrowers with low credit ratings to enter into illegal loan agreements with onerous terms.

7

35.     Continental's business operations described in this Complaint violate Maryland law. Continental has an experienced compliance and legal department, which knows that Continental's credit business is in violation of Maryland law. Continental has employed specific strategies to thwart enforcement of Maryland law on its operations, including the sham "rent-a-bank" scheme described in this Complaint which Continental created and operates in order to provide Continental with the pretense that a federally-insured bank or financial institution is involved in its lending operations and that Continental can use the federally-insured institution to evade Maryland lending laws and profit from doing so.

### *Continental Advertises Its Credit Cards as Tools to Improve Credit Ratings*

36.     Continental targets its advertising to encourage consumer borrowers who are trying to rebuild their credit to obtain a Continental credit card in order to improve their credit records, histories, and ratings.

37.     Continental marketed its credit cards to Plaintiff Johnson and Class Members using a variety of means, including direct mail, e-mail, marketing through affiliates, and the Internet.

38.     Continental advertises that "we understand how to help people improve their credit score by giving them an opportunity when other companies won't."

39.     Continental's marketing includes a blog called the "Continental Finance Blog" which advertises that it is providing advice on "HOW TO BUILD AND MAINTAIN GOOD CREDIT."

40.     Continental advertises that it is the "company mission to help cardholders everywhere rebuild and restore their credit."

41.     Continental advertises that it provides advice and assistance on "how to boost your credit score fast" including "how to increase credit score," "how quickly you can improve your credit score," "tips on how to raise credit score in 30 days" and "best ways to boost your credit score."

42.     Continental advertises that "If you have less than perfect credit, a CFC brand card can help you re-establish your credit history!"

43.     Continental advertises that "Continental Finance is one of the leading providers of credit cards for people with less-than-perfect credit. They can help you get closer to qualifying for a rewards card over time. This blog and other educational resources will help you qualify for a card and then use the card responsibly to help mend your credit."

44.     Continental advertises that "Continental Finance cards" provide "***Credit-building features***" and further advertises that:

> One of the best credit-building features that all Continental Finance cards provide is:
>
> Regular and frequent account reviews for credit limit increases. Simply make your first six required monthly minimum payments on-time and you'll be eligible for an automatic review for a credit limit increase.
>
> Beyond Credit Limit Increases, the card has more features to assist with building credit, including:
>
> Monthly reporting to the three major credit bureaus.
>
> There is also a $0 Fraud liability feature to help protect you from fraudulent charges and keep your credit history positive.
>
> The 24/7 online customer platform gives you custom alerts to help you keep up with payments, avoid late fees and ensure your credit building efforts stay on track.
>
> You'll also get free online access to your credit score each month by signing up for e-statements in the customer platform.

45.     Continental advertises that it offers access to credit to consumers, including consumers in Maryland.

46.     Continental advertises that it is a "financing solution" for consumers who do not meet the criteria for "prime" credit. It advertises that it is a "Leading Provider of Non-Prime Consumer Financial Solutions." It advertises that "[w]e specialize in servicing 'second-look financing' for consumers who are turned down by a prime lender, yet are just slightly below the prime threshold, and by servicing direct-to-consumer credit cards for consumers who are establishing or rebuilding their credit."

47.     Continental advertises that it "is the largest provider in the near-prime financial services space, having originated $6 Billion in assets to date and processing 12 Million applications annually. Our Private Label Credit Card (PLCC) business has achieved over $2.6 Billion in originations and has experienced over 40% growth since 2018."

48.     Continental advertises that its services help consumers to "rebuild" credit. It advertises that its products give consumers the "opportunity to build and access credit."

49.     Continental advertises that "[w]e specialize in providing credit cards that help our customers build or establish credit with dignity and respect. If you have less than perfect credit, a CFC brand card can help you re-establish your credit history!"

50.     Continental advertises that "With our help, non-prime consumers can buy quality products and services without depleting their savings account."

51.     Continental advertises that it "provide[s] accounts to consumers when primary lenders cannot."

52.     Continental advertises that it "provid[es] non-prime consumers a second chance to access quality financing solutions and direct-to-consumer credit cards."

10

53.     Continental advertises that "[w]e pride ourselves on offering the same credit experience to non-prime customers that prime customers receive."

### Continental Uses A Rent-A-Bank Scheme to Obtain Credit for Plaintiff and Class Members

54.     Continental developed a credit origination engine that, for Continental, ensures profits and eliminates risks. Drawing upon expertise in credit data analysis, mass marketing and debt collection, Continental built a specialized business model which enables it to prosper by purportedly "serving" – but in fact victimizing – poor and disadvantaged consumers. Continental's business is to extend small credit card loans with high fees and interest rates to borrowers with low credit ratings by using third-party financial institutions, with the promise to the borrowers that these loans will improve the borrowers' credit ratings. In fact, Continental's lending practices place these vulnerable consumers into more debt and aggravate the consumers' credit problems by increasing their indebtedness and imposing illegal lending terms.

55.     In order to conceal the unlawful nature of extensions of credit, Continental partnered with third-party financial institutions, which are in some cases exempt from many Maryland lending laws, as part of a "rent-a-bank" scheme.

56.     To effectuate this scheme, Continental agreed with the third-party financial institutions in agreements including "Program Agreements," that Continental would market credit cards to, and solicit credit card applications from, consumers like Plaintiff and Class Members.

57.     Under the contracts between Continental and its third-party financial institution partners, including the Program Agreements, Continental is the true lender in the transactions of Plaintiff and Class Members.

58.      For example, Continental agreed in advance with its third-party financial institution partners that Continental would perform the marketing for the credit card accounts of Plaintiff and Class Members. Under Continental's agreements with its third-party financial institution partners, Continental marketed via direct mail, and through various modes of internet marketing. Continental prepared the product offerings and associated marketing materials, developed and placed electronic and print advertising, designed and developed websites, and delivered all notices and disclosures to Plaintiff and Class Members. Continental alone was responsible for all costs and expenses associated with advertising and developing promotional materials in connection with the loans to Plaintiff and Class Members.

59.      Continental also agreed in advance with its third-party financial institution partners that Continental would provide the analytics, software, and underwriting models to underwrite the loans resulting from its marketing efforts, and that Continental would perform the underwriting for the credit card accounts resulting from its marketing efforts. Continental developed its own credit models for underwriting, based on data concerning prior Continental customers. As part of Continental's underwriting, it considered the risk of customers missing payments, the likelihood that a borrower would use a Continental credit card for a cash advance instead of a purchase, the borrower's history with other Continental credit cards, and other factors. Continental underwrote the loans of Plaintiff and Class Members. Continental alone was responsible for all costs and expenses associated with underwriting the loans to Plaintiff and Class Members.

60.      Continental provided the loan application for Plaintiff and each Class Member. Continental processed all loan applications from Plaintiff and each Class Member to determine whether the Plaintiff and each Class Member met eligibility criteria for the extension of credit,

responded to all inquiries regarding the credit origination and application process, delivered all documents to Plaintiff and Class Members in the course of the credit origination and application process, and maintained all documents pertaining to the loans to Plaintiff and each Class Member.

61.     Continental, in Plaintiff and each Class Member's transaction, also conducted credit risk assessment and loan underwriting.

62.     Continental determined that Plaintiff and each Class Member satisfied the criteria required for an extension of credit and determined the amount of each extension of credit.

63.     Continental evaluated and approved the credit application for Plaintiff and each Class Member.

64.     Continental determined the amount of credit to be extended to Plaintiff and each Class Member.

65.     Continental approved the extension of credit to Plaintiff and each Class Member.

66.     Continental drafted and provided the credit account agreements for Plaintiff and each Class Member. Continental's form adhesion loan "agreement" documents included language stating that the terms of the agreement could be changed at any time, without any notice, and with retroactive effect.

67.     Although Continental is the true lender in the transactions of Plaintiff and Class Members, Continental does not issue the credit cards it advertises. Instead, Continental represented to Plaintiff and each Class Member that the credit account would be issued, and credit initially extended, by a third-party financial institution. Those accounts were issued under Continental's oversight and Continental's contracts with its third-party financial institution partners, at Continental's request, in the amount requested by Continental.

68.     Under Continental's advance agreements with its third-party financial institution partners, Continental promptly after account issuance purchases the right to fund the credit and collect all payments on the credit card accounts it arranged for Plaintiff and each Class Member.

69.     Continental promptly purchased Plaintiff's and each Class Member's credit account receivables from its third-party financial institution partner, and thereafter extended all credit and collected all payments on Plaintiff's and Class Members' accounts unless and until the accounts were charged-off and sold to one of Continental's debt buyers. Continental directed Plaintiff and each Class Member to make payments to Continental, not Continental's third-party financial institution partner.

70.     Continental arranged with its third-party financial institution partners, in advance of originating the credit accounts for Plaintiff and Class Members, that Continental would advertise and market for the credit accounts, that it would handle all of the work necessary to originate the credit accounts, would service the credit accounts after origination, and that it would be entitled to collect and receive all payments made on the credit accounts, despite the fact that the credit accounts were issued by Continental's third-party financial institution partner.

71.     Continental managed all the operations relating to the submission of credit applications by Plaintiff and each Class Member and the extension of credit to Plaintiff and each Class Member, in exchange for a fee.

72.     Continental had agreed, in advance, to collect all payments, interest and fees due on the credit accounts of Plaintiff and each Class Member.

73.     Continental, not its third-party financial institution partners, collected all sums – including fees – from Plaintiff and each Class Member. Continental also charged interest to Plaintiff and each Class Member, and collected interest from Plaintiff and each Class Member

14

74.     Continental serviced and administered each loan to Plaintiff and each Class Member. This servicing and administration included issuing statements, payment processing, collections customers service, refunds and adjustments, customer disputes, and other services.

75.     Continental undertook to recover and collect the maximum payment of interest and principal possible from Plaintiff and Class Members, for its own benefit.

76.     Plaintiff and Class Members made all payments on the credit accounts originated by Continental to Continental, unless and until their loans were "charged off" and sold at a discount to a debt-buyer debt collector.

77.     The only contact Plaintiff and Class Members had with Continental's third-party financial institution partners in connection with their credit accounts through Continental was the partner's name on the credit agreement.

78.     In exchange for Continental's role in assisting Plaintiff and Class Members to obtain credit accounts, Continental received, through its contracts with its third-party financial institution partners, the exclusive right to collect all payments of principal, interest and fees, from Plaintiff and each Class Member. This arrangement rendered Continental the *de facto* lender; the true lender. Continental's reason for existence was to profit by purportedly providing advice and assistance to consumers, including Plaintiff and Class Members, in obtaining loans nominally from a third-party financial institution, so that Continental would receive, in reciprocation, the legal right to receive payments from Plaintiff and Class Members.

79.     This arrangement has been a lucrative business for Continental.

80.     Continental provided Plaintiff and each Class Member with advice or assistance in the obtention of an extension of credit by others, and was compensated for doing so by collecting money including fees directly from Plaintiff and each Class Member.

81.     Not only did Continental broker the Plaintiff's and Class Members' extensions of credit without a license, Continental *de facto* brokered the loans to itself, deceptively disguising the loans as legitimate loans.

82.     Although the Plaintiff's and Class Members' loans were purportedly initially issued by its third-party financial institution partner, Continental exerted control and ownership over those loans. Continental carried out all interactions with the Plaintiff and each Class Member, accepted the ultimate credit risk, collected and pocketed the finance charges and fees, and owned and controlled the branding of the credit accounts, which were only available through Continental. Continental was in fact the primary lender, creditor and collector in connection with the loans that it made to Plaintiff and each Class Member.

83.     Continental had the predominant economic interest in the loans it provided to Plaintiff and Class Members.

84.     Continental formed its arrangement to have third-party financial institutions issue the credit cards it advertises and collects on as part of a specific effort to avoid state lending laws – including Maryland's lending laws.

85.     At all material times, Continental knew or acted with reckless disregard to the fact that it could not legally extend credit, because, as Continental knows and always knew, the terms of the credit card loans it markets, underwrites, funds and services are in violation of the laws of many states – including Maryland's.

86.     Indeed, in connection with securitizations collateralized by Continental's credit card account receivables, Continental hired a bond rating agency which observed that the securities are risky because if a court finds that Continental is the "true lender" because of its arrangement to market and purchase credit card receivables from third-party financial

institutions, the credit card receivables could be legally unenforceable; but also observed that the short life of the credit accounts and the quickly revolving nature of the credit accounts mitigated those risks.

87.     In other words, Continental knows that its loans are illegal, but perceives that it can get away with its illegally lending scheme because no one is likely to notice when Continental is extending small-dollar credit card loans to low income, credit-impaired consumers.

### *The Continental Entities Conspired to Conduct Illegal Activity*

88.     Continental's unlawful conduct described in this Complaint was the result of a conspiracy involving CFC and CP and other entities owned or operated by CFC, and third-party financial institutions.

89.     CFC and CP entered into multiple agreements under which the entities conspired, agreed, and aided and abetted the illegal conduct of the others.

90.     In committing the actions causing injuries and damages to Plaintiff and Class Members, CFC and CP confederated with other persons, including each other, by agreement or understanding. CFC and CP's agreements and understandings with each other included agreements allocating responsibility among CFC and CP and third-party financial institutions for each of the acts alleged in this Complaint – including but not limited to marketing for loan accounts, originating loan accounts, issuing credit cards, taking ownership of loan accounts, servicing loan accounts, and selling loan accounts.

91.     In furtherance of this conspiracy, CFC and CP each committed numerous unlawful acts, and used unlawful and tortious means to accomplish other acts.

92.     Among other things, and without limitation, CFC marketed for loan accounts which were represented to Plaintiff and Class Members as accounts with CFC, CFC originated

17

unlawful loan accounts which were represented to Plaintiff and Class Members to be accounts with CFC, and third-party financial institutions issued the credit cards on those accounts. CP purchased the credit card loan account receivables, CFC serviced the unlawful loan accounts it originated, and collected money for itself and CP from Plaintiff and Class Members. By undertaking these acts and others, CFC and CP provided substantial assistance, aid and encouragement to each other, and to the third-party financial institutions issuing the credit cards, in connection with the tortious actions alleged in this Complaint.

93.     For CP's part, among other things and without limitation, CP contracted with CFC and third-party financial institutions that CFC would market credit card loan accounts to consumers including Plaintiff and Class Members, that the third-party financial institutions would nominally issue the credit cards, and CFC, CP and third-party financial institutions agreed that the third-party financial institutions would continually transfer on an ongoing basis, all of their rights, title, and interest in the account receivables to CP.

94.     As a result of the conspiracy, Plaintiff and Class Members sustained the actual legal damages alleged herein.

95.     CFC and CP each had actual knowledge of the wrongful conduct perpetrated by the others in their dealings with the Plaintiff and Class Members, and of the role each played in furthering that conduct.

96.     In its dealings with Plaintiff and Class Members, CP was acting at all times relevant to the allegations contained in this Complaint as the agent of CFC.

97.     When perpetrating the acts alleged herein causing injury or damages to Plaintiff and Class Members, CP and the employees and representatives and agents of CFC committed

those acts within the scope of the employment or agency, and when performing services for which he or she or it had been engaged, and when acting in furtherance of CFC's interests.

98.     As a consequence, Plaintiff and the Class have sustained the losses and damages described herein.

99.     Continental, including both CFC and CP, arranged their associations with third-party financial institutions in furtherance of a conspiracy to perpetrate their unlawful lending and credit services business scheme and to try to circumvent state consumer lending laws, like Maryland's.

### *Continental Does Not Have Any License to Conduct Its Business in Maryland*

100.     Continental does not have any license to conduct its credit services and lending business in Maryland and has never had any license to conduct its credit services and lending business (or any business) in Maryland.

101.     However, Maryland law requires Continental to be licensed by the Commissioner of Financial Regulation to conduct its credit services and lending business in Maryland. For example, both the MCSBA and the MCLL require Continental to have licenses that it does not have and has never had.

### *Continental Violated the MCSBA in Class Member Transactions*

102.     Continental, including both CFC and CP, is a "credit services business" under the MCSBA § 14-1901(e)(1)(ii). Continental, with respect to the extension of credit by third-party financial institutions, sold, provided, performed, or represented that it could or would sell, provide, or perform, the following services in return for the payment of money or other valuable consideration: (i) improving a consumer's credit record, history, or rating or establishing a new credit file or record, or providing advice or assistance to a consumer with regard to improving the consumer's credit record, history, or rating or establishing a new credit file or record; and (ii)

obtaining an extension of credit for a consumer, or providing advice or assistance to a consumer with regard to obtaining an extension of credit for the consumer. Continental's advertising about its credit improvement and assistance services are detailed in this Complaint, as are Continental's acts in obtaining extensions of credit for consumers from, or purportedly from, third-party financial institutions.

103.     CFC and its wholly-owned subsidiary CP have a joint or common interest, including a joint interest in the credit card accounts of Plaintiff and Class Members.

104.     Continental violated numerous mandates of the MCSBA in its dealings with Plaintiff and Class Members.

105.     Continental received money or other valuable consideration from Plaintiff and Class Members when it had not secured a license from the Maryland Commissioner of Financial Regulation under Title 11, Subtitle 3 of the Financial Institutions Article, in violation of the MCSBA § 14-1902(1).

106.     Continental received money and valuable consideration solely for the referral of Plaintiff and Class Members to a credit grantor when the credit extended to the Plaintiff and Class Members was substantially on the same terms as those available to the general public, in violation of MCSBA §14-1902(2).

107.     Continental never provided to Plaintiff or any Class Member any of the disclosures required by the MCSBA §14-1906, and never provided Plaintiff or any Class Member the "NOTICE OF CANCELLATION" required under that section.

108.     Moreover, Continental was not licensed as required by the MCSBA. Accordingly, it was prohibited from receiving any money or valuable consideration from Plaintiff or any Class Member under the MCSBA § 14-1902(1).

109.    Furthermore, Continental's purported contracts for services with Plaintiff and each Class Member did not comply with the MCSBA. Accordingly, the purported contracts were void and unenforceable under the MCSBA § 14-1907(b), and Continental was never entitled to enforce any terms of any of those purported contracts or collect any money from Plaintiff or any Class Member in connection with those purported contracts.

110.    A credit services business license is subject to the licensing and investigatory provisions of the Maryland Installment Loans – Licensing Provisions, Md. Code Ann., Fin. Inst. §§ 11-301 *et seq.*, which require a license before Continental could make any loans to Plaintiff or Class Members. Continental's lack of the required license means it never had the right to collect any money from Plaintiff or Class Members.

111.    In addition, a credit services business license is subject to the provisions of the Maryland Consumer Loans – Licensing Provisions, Md. Code Ann., Fin. Inst. §§ 11-201 *et seq.* For that reason, as well, Continental was never entitled to collect any money from Plaintiff or Class Members.

### *Continental Violated the MCLL in Class Member Transactions*

112.    Each Class Member transaction involved a loan or advance of money or credit of less than $25,000.00, subject to the MCLL.

113.    Continental made a loan to Plaintiff and each Class Member. Continental did not perform its services in arranging loans with third-party financial institutions for free; it was amply compensated for its loan operation. In exchange for Continental's role in assisting Plaintiff and Class Members to obtain loans, Continental received, through contracts with the third-party financial institutions, the exclusive right to collect all payments of principal, interest and fees, including fees charged for preparing and processing the loans. Indeed, Continental purchased

the right from the third-party financial institutions to enforce the terms of the loans to Plaintiff
and Class Members, and to collect the payments that were to be made by Plaintiff and Class
Members under the terms of the loan, including all interest, penalties, and fees. Indeed, if
Plaintiff or Class Members mistakenly sent a loan payment to the third-party financial institution,
rather than to Continental, the third-party financial institution was, pursuant to its contract with
Continental, obligated to forward that payment to Continental.

114.     The third-party financial institutions never received any payments from Plaintiff
or Class Members, Continental did. Continental's *raison d'etre* was to profit by purportedly
providing advice and assistance to consumers in obtaining loans from the third-party financial
institutions it had partnered with so that it would receive, in reciprocation, the legal right to
receive payments from consumers like Plaintiff and Class Members. Plaintiff and Class Members
made direct payments on their loan accounts to Continental. Continental deducted amounts
from Plaintiff and Class Members' loans as "fees" which were to pay for the preparation and
processing of their loans.

115.     Plaintiff and Class Members made numerous payments to Continental, including
interest, costs, fees and other charges. Continental received and retained Plaintiff and Class
Members' payments.

116.     Continental is in the business of making loans of less than $25,000.00. In fact, all
of its loans to Plaintiff and Class Members are for less than $6,000.00. Continental makes
numerous such loans to Marylanders each year.

117.     Continental does not have a license under the MCLL, as required under MCLL §
12-302.

118.    None of the loans of Plaintiff or Class Members contain a written election to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article.

119.    Continental was not permitted to make its loans to Plaintiff or Class Members because it is not, and never has been, licensed under or exempt from the licensing requirements under the MCLL.

120.    Continental's loans to Plaintiff and each Class Member are void and unenforceable because Continental made the loans without a license under the MCLL, when Continental is not exempt from the licensing requirements of the MCLL.

121.    Continental has unlawfully received and retained, and continues to receive and retain, principal, interest, fees, and other compensation with respect to its loans to Plaintiff and Class Members, which are void and unenforceable under the MCLL.

122.    Continental is not, and has never been, licensed as required by Maryland law, the statutes requiring Continental to be licensed are regulatory in nature for the protection of the public, rather than merely to raise revenue, and Continental's actions described in this Complaint violate the fundamental public policy of Maryland.

123.    Continental never had any right to collect money from Plaintiff or Class Members, as a result of Continental's illegal, unlicensed activity.

### *Plaintiff's Experiences*

124.    Plaintiff, Ms. Johnson, received a credit card loan from Continental in the amount of less than $6,000.00, for consumer, family and household purposes, when Continental did not have a license to make such a loan under Maryland law and when Continental was not exempt from the licensing requirements of Maryland law.

125.    Ms. Johnson obtained the credit card loan from Continental in Maryland in response to Continental's marketing efforts. Continental took Ms. Johnson's loan application, underwrote it, decided to extend credit to her, and arranged for a credit card to be sent to her.

126.    Ms. Johnson accepted and used the credit card in Maryland, and made payments on the credit card in Maryland.

127.    Ms. Johnson's credit card was issued by one of Continental's third-party financial institution partners, but Continental – under a pre-existing agreement – promptly purchased and obtained the right to extend and collect all amounts under Ms. Johnson's account.

128.    Continental deducted amounts from Ms. Johnson's loan as "fees" which were to pay for the preparation and processing of her loan.

129.    Continental's form adhesion documents for Ms. Johnson's loan also included provisions giving Continental the right to unilaterally change any of its agreements with her, at any time, without advance notice or an opportunity for her to reject any changes.

130.    Ms. Johnson made numerous payments to Continental, including interest, costs, fees and other charges. Continental received and retained her payments. Ms. Johnson never made any payment on the account to the third-party financial institution that issued the loan.

### *Class Action Allegations*

131.    The Class, as defined above, is identifiable.  The Plaintiff is a member of the Class. The Class is so numerous that joinder of all members is impracticable.

132.    There are questions of law and fact which are not only common to the members of the Class but which predominate over any questions affecting only individual Class members. The common and predominating questions include, but are not limited to:

A.   Whether Continental acted as a credit services business under the
     MCSBA in Class Members' transactions;

B.   Whether Continental failed to make any of the disclosures required
     by the MCSBA § 14-1906;

C.   Whether Continental was required to be licensed with the
     Maryland Commissioner of Financial Regulation before engaging
     in transactions with Plaintiff and Class Members;

D.   Whether Continental's transactions with each Class Member are
     contrary to the public policy of Maryland;

E.   Whether the statutes requiring Continental to be licensed are
     regulatory in nature for the protection of the public, rather than
     merely to raise revenue, and enforcing Class Members'
     Continental loan accounts is against public policy;

F.   Whether Continental ever had any right to receive or retain any
     payments on Class Members' loans;

G.   Whether each Class Member is entitled to a declaration under the
     Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud.
     Pro. §§ 3-401 *et seq.* that their loan account is void and
     unenforceable; and

H.   Whether each Class Member is entitled to recover all payments
     made to Continental under the MCLL.

133.    Plaintiff's claims are typical of the claims of the respective members of the Class within the meaning of Md. Rule 2-231(b)(3) and are based on and arise out of similar facts constituting the wrongful conduct of Defendants.

134.    Plaintiff will fairly and adequately protect the interests of the Class within the meaning of Md. Rule 2-231(b)(4).  Plaintiff is committed to vigorously litigating this matter. Further, Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

135.    Neither Plaintiff nor Plaintiff's counsel has any interests which might cause them not to vigorously pursue this claim.

136.    The prosecution of separate actions by individual members of the Class would create a risk of establishing incompatible standards of conduct for Defendants within the meaning of Md. Rule 2-231(c)(1)(A).

137.    Defendants' actions are generally applicable to the respective Class as a whole, and Plaintiff seeks equitable remedies with respect to the Class within the meaning of Md. Rule 2-231(c)(2).

138.    Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class and a class action is the superior method for fair and efficient adjudication of the controversy within the meaning of Md. Rule 2-231(c)(3).

139.    The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

140.    Plaintiff's counsel are experienced in class actions, and foresee little difficulty in the management of this case as a class action.

## Causes of Action

**COUNT I.**       **Declaratory Relief under Md. Cts. & Jud. Pro. § 3-406**

141.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

142.     This claim for declaratory relief is brought under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. § 3-406, to settle and obtain relief from uncertainty and insecurity with respect to the rights, status and legal relations of the Plaintiff and Class Members with Defendants, under the consumer protections embodied in Maryland law.

143.     Defendants maintain that they were not required to have a license from the Maryland Commissioner of Financial Regulation to engage in their transactions with Plaintiff and Class Members.

144.     Plaintiff maintains that Defendants were required to have a license from the Maryland Commissioner of Financial Regulation to engage in the transactions with Plaintiff and Class Members.

145.     Defendants maintain that they did not violate the MCSBA or the MCLL in the transactions of Plaintiff and Class Members.

146.     Plaintiff maintains that Defendants violated the MCSBA and the MCLL in their transactions and the transactions of Plaintiff and Class Members.

147.     Plaintiff maintains that any purported contract between her and Continental, and between any Class Member and Continental, is void *ab initio* and unenforceable as contrary to the public policy of Maryland, under the MCSBA.

148.    Defendants maintain that purported contracts between Plaintiff and Continental, and between other Class Members and Continental, are not void *ab initio* and unenforceable as contrary to the public policy of Maryland under the MCSBA.

149.    Defendants maintain that they and their assignees may assess and collect charges from Plaintiff and Class Members.

150.    Plaintiff maintains that Defendants do not have, and never had, the right to assess or collect charges from her, or from Class Members, and that the Defendants never had the right to assign any such rights to anyone else, due to the facts alleged in this Complaint.

151.    Plaintiff and Class Members have received or will receive collection notices from Defendants or their assignees demanding payment of the alleged amounts due and have been sued or will be sued for collection of the sums which Defendants or their assignees claim are due. Moreover, Defendants notify credit reporting agencies of the alleged balances due, thereby damaging the credit scores and history of Plaintiff and Class Members.

152.    These practices continue and will continue unless and until this Court declares and affirms that Defendants do not have, and never had, the right to receive or retain money from Plaintiff and Class Members on their loan accounts.

153.    This presents an actual, justiciable controversy between the parties relating to the construction of the purported contracts of Plaintiff and Class Members and the application of the law to those purported contracts. Defendants have sought and will continue to seek to collect amounts from Plaintiff and Class Members when they are not legally entitled to do so. Defendants continue to harm Plaintiff and Class Members by doing so.

154.    Plaintiff and Class Members have a right to be free from the attempts of Defendants to collect amounts from them to which Defendants have no right.

**COUNT II.**         **Violation of the MCLL Licensing Provisions**

155.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

156.    Each of the loans to Plaintiff and Class Members which are the subject of this Complaint were for less than $25,000, are extensions of credit or loans subject to the MCLL and are "loans" under the MCLL.

157.    Continental, including CFC and CP, made the loans to Plaintiff and Class Members which are the subject of this Complaint, and thus is a "lender" under the MCLL.

158.    None of the loans to Plaintiff or Class Members elect to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

159.    Continental made loans to Plaintiff and Class Members of less than $25,000 when Continental was required to be licensed under MCLL § 12-302, but Continental was not and never has been licensed under or exempt from the licensing requirements of the MCLL.

160.    The loans to Plaintiff and Class Members are and always were void and unenforceable under the MCLL.

161.    Continental was never entitled to receive or retain any principal, interest, fees, or other compensation with respect to any loan to Plaintiff or Class Members, under MCLL § 12-314.

162.    In violation of the MCLL, Continental, with respect to the Plaintiff's and Class Members' loans that are and always were void and unenforceable, collected and attempted to collect, directly or indirectly, amounts from Plaintiffs and Class Members, and sold, assigned, or otherwise transferred loans of Plaintiff and Class Members to other persons.

29

WHEREFORE, Plaintiff demands declaratory judgment and judgment in an aggregated amount for the Class as a whole in excess of $75,000.00, as follows:

A.  A declaratory judgment establishing that Continental was required to be licensed by the Commissioner of Financial Regulation to undertake the actions alleged in this Complaint;

B.  A declaratory judgment establishing that Continental never had any right to collect any money from Plaintiff or Class Members, and that Plaintiff and Class Members' loans and agreements with Defendants are, and always were, void and unenforceable;

C.  A declaratory judgment establishing that Defendants never had any right to collect any money from Plaintiff or Class Members;

D.  Payment to Plaintiff and Class Members of the statutory damages imposed under MCLL § 12-314, including a return to Plaintiff and Class Members of principal, interest, and other compensation received by Defendants on their accounts;

E.  Pre-judgment and post-judgment interest at the legal rate on all sums awarded to Plaintiff and Class Members; and,

F.  Such other and further relief as the nature of this case may require.

Respectfully submitted,

Benjamin H. Carney (CPF No. 0412140132)
bcarney@GWCfirm.com

30

Richard S. Gordon (CPF No. 8912180227)
rgordon@GWCfirm.com
GORDON, WOLF & CARNEY, CHTD.
100 West Pennsylvania Ave., Suite 100
Towson, Maryland 21204
Telephone: (410) 825-2300
Facsimile: (410) 825-0066

*Attorneys for Plaintiff and the Class*

## JURY TRIAL

Plaintiff demands a trial by jury on all issues triable of right by a jury.

Benjamin H. Carney