IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TIFFANY JOHNSON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 8:22-cv-02001-PX |
| | * | |
| CONTINENTAL FINANCE COMPANY, LLC, *et. al.*, | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |
| TRACEY CRIDER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 8:23-cv-00854-PX |
| | * | |
| CONTINENTAL FINANCE COMPANY, LLC, *et. al.*, | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | *** | |

## MEMORANDUM OPINION

Pending before the Court in this consolidated matter are the motions to compel arbitration filed by Defendants Continental Finance Company, LLC and Continental Purchasing, LLC (together "Continental"). No. 22-cv-2001 (hereinafter "*Johnson*"), ECF No. 13; No. 23-cv-854 (hereinafter "*Crider*"), ECF No. 9. Also pending is Continental's motion to strike class allegations, *Crider*, ECF No. 9, and Plaintiff Tiffany Johnson's unopposed motion to amend her Complaint, *Johnson*, ECF No. 16. The motions are fully briefed, and no hearing is necessary. D. Md. Loc. R. 105.6. For the following reasons, the Court DENIES Continental's motions and GRANTS Johnson's motion.

I.    **Background**[1]

Continental, a loan originator, marketer, and servicer, extended credit cards to Maryland residents, including Plaintiffs Tiffany Johnson and Tracey Crider.  *Johnson*, ECF No. 4 ¶¶ 29, 33, 54–60; *Crider*, ECF No. 4 ¶¶ 17, 38–46.  Continental engages a third-party financial institution to extend the short-term unsecured credit, then Continental buys back the loans and rights to collect payments.  *Johnson*, ECF No. 4 ¶¶ 68–69; *Crider*, ECF No. 4 ¶¶ 54–55.

Plaintiffs initially filed suit in state court, challenging that this buyback arrangement was designed to circumvent the lender licensing requirements set forth in the Maryland Credit Services Business Act, Md. Code Ann., Com. Law §§ 14-1901, *et seq.*, and the Maryland Consumer Loan Law, Md. Code Ann., Com. Law §§ 12-301, *et seq. Johnson*, ECF No. 4 ¶ 100–01; *Crider*, ECF No. 4 ¶ 101.  Continental timely removed both matters to this Court and next moved to compel arbitration of the claims based on the arbitration provision within the cardholder agreements.  *Johnson*, ECF No. 13-1 at 1–2; *Crider*, ECF No. 9 at 6–7.

Plaintiffs oppose arbitration on the grounds that they never formed a binding agreement to arbitrate such disputes.  The argument depends on a proper reading of the Cardholder Agreement (the "Agreement") and its inclusive arbitration provision (the "Arbitration Provision"), and so the Court will describe the Agreement in some detail.[2]

The Cardholder Agreement is a single 13-page document that divides into several sections, each separated with prominent, underlined short titles.  *Johnson*, ECF No. 13-5.  The first, entitled, "Your Agreement With Us," sets out the basics of the contractual relationship.  *Id.*

---

[1] The Court considers the facts in the light most favorable to Plaintiffs as the non-movants.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

[2] The Cardholder Agreements are materially the same in both *Johnson* and *Crider*, and thus unless otherwise noted, the Court will refer to both when discussing the Cardholder Agreement, and cite solely to the Cardholder Agreement filed in *Johnson*.

at 4.  It defines terms used throughout to identify Continental ("we" and "us") and the cardholder ("you" and "your").  *Id.*  This section also plainly states that "[t]his Agreement covers the terms and conditions of the Card Account," all of which are accepted upon the cardholder's receipt and use of the credit card.  *Id.*

This section next announces, under the bold heading, "Applicable Law," the Agreement's choice of law provision.  It states:

> **Applicable Law:** This Agreement and your Account, and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or related to your Account, this Agreement or any transferred balances, are governed by and construed in accordance with applicable federal law and, to the extent not preempted by federal law, by the laws of [Utah in *Johnson* and Missouri in *Crider*.].

*Id.* at 5; *Crider*, ECF No. 9-5 at 5.

The section next includes a clause entitled "Changes in Agreement Terms," which sets forth Continental's power to change any term within the Agreement (the "Change Clause").  It reads:

> **Changes in Agreement Terms**: *We can change any term of this Agreement,* including the rate at which or manner in which INTEREST CHARGES, Fees, and Other Charges are calculated, in our sole discretion, upon such notice to you as is required by law. At our option, any change will apply both to your new activity and to your outstanding balance when the change is effective as permitted by law.

*Johnson*, ECF No. 13-5 at 5 (bold emphasis in original) (italic emphasis added).

The final section of the Agreement, entitled "Arbitration Provision," sets out the terms under which the parties will arbitrate any dispute that "arises out of…the Agreement."  *Id.* at 12. It begins: "PLEASE READ CAREFULLY: This Arbitration Provision ('the Provision') waives any right to file claims in court, other than a small claims court, or to participate in a class action or other consolidated proceeding."  *Id.* at 12.  The Arbitration Provision also allows for advance opt-out and directs that arbitration will be conducted by the American Arbitration Association;

that either party may request a hearing; that the lender will advance the cardholder's portion of the filing and hearing fees; and that "[a]ll issues of arbitrability must be arbitrated," to include whether the Arbitration Provision "is enforceable or applicable." *Id.* at 12–13.

Because both actions concern the terms by which Continental extended consumer credit, Continental moves to compel arbitration pursuant to the Arbitration Provision. *Johnson*, ECF No. 13; *Crider*, ECF No. 9. In *Crider*, Continental separately moves to strike the class allegations, arguing that the Arbitration Provision prohibits the cardholder from pursuing class claims. *Crider*, ECF No. 9. The cases have been consolidated and the motions are now ripe for resolution. The Court turns first to the motions to compel arbitration.

## II.     Motions to Compel Arbitration

### A.     Standard of Review

Plaintiffs oppose the motion to compel arbitration, arguing that the provision is "illusory," or lacking in adequate consideration such that the parties never formed a binding agreement to arbitrate in the first instance. *Johnson*, ECF No. 14 at 25–26. Where, as here, the motion to compel arbitration implicates whether such an agreement was ever formed, the Court treats the motion as one for summary judgment. *See Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 454 (D. Md. 2020) (quoting *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 589 (D. Md. 2013)) (treating a motion to compel arbitration as a motion for summary judgment where "the formation or validity of the arbitration agreement is in dispute"). The Court may consider documents outside the pleadings "to effectively assess the merits of this motion." *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683–84 (D. Md. 2004).

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds that no

4

genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original).

The Federal Arbitration Act, 9 U.S.C. §§ 1–16 ("FAA"), governs the Court's review of a motion to compel arbitration. To prevail, the movant must show the existence of (1) a dispute between the parties; (2) a written arbitration provision that purports to cover the dispute; (3) a relationship between the transaction and interstate or foreign commerce; and (4) the failure of a party to arbitrate the dispute. *See Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

**B.     Analysis**

Plaintiffs argue that Continental cannot show the Arbitration Provision covers this dispute, as required under the FAA, because no binding agreement to arbitrate was ever formed. *Johnson*, ECF No. 14. Specifically, Plaintiffs contend that because the Change Clause permits Continental to modify any aspect of the Agreement, including the Arbitration Provision, at will and at any time, any pre-existing promises to arbitrate struck between the parties are illusory, or lack consideration, and thus do not constitute a validly binding contract. *Id.* at 26–30.

As a threshold matter, the parties dispute which substantive law governs this contract formation question. Continental urges that the Arbitration Provision incorporates the

"Applicable Law," or choice-of-law, provision and so the Court must apply Utah and Missouri law respectively. *Johnson*, ECF No. 15 at 7; *Crider*, ECF No. 9 at 11–12. Although generally, the Court must honor the parties' agreement to apply selected substantive state law, this presupposes that the agreement is binding in the first instance. But until the Court determines whether the Arbitration Provision was ever formed, it cannot enforce any of its terms, including a choice-of-law provision. *See James v. Synovus Bank*, No. TDC-19-1137, 2020 WL 1479115, at *2 (D. Md. Mar. 26, 2020); *Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*, No. CCB-14-3031, 2016 WL 930965, at *4 (D. Md. Mar. 11, 2016) ("The choice of law provision is not, however, applicable to the question of whether a contract was formed, as application of the provision presupposes an enforceable contract.").

Accordingly, the Court applies Maryland choice of law principles to determine which state's contract law applies. *See Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). In Maryland, the Court applies the law of the state "where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs., Inc.,* 142 Md. App. 476, 490 (2002); *see also Francis*, 709 F.3d at 369. The parties do not dispute that the Cardholder Agreement was "made" where Plaintiffs accepted and used the card, *Johnson*, ECF No. 13-5 at 4, which was in Maryland, *Johnson*, ECF No. 4 ¶¶ 28, 126; *Crider*, ECF No. 4 ¶¶ 12, 140. Thus, the Court applies Maryland common law.

Next, Continental argues that the arbitrator, not this Court, must decide whether the parties formed a binding agreement to arbitrate. *Johnson*, ECF No. 15 at 3. Continental cites to the Arbitration Provision's direction that "[a]ll issues of arbitrability must be arbitrated, including but not limited to whether the [Arbitration] Provision is enforceable." *Johnson*, ECF No. 13-5 at 12. However, as with its choice-of-law argument, Continental presupposes that the

6

parties had formed a binding arbitration agreement.  If, as Plaintiffs maintain, the parties never formed an agreement to arbitrate, then the Arbitration Provision's delegation of decisions to the arbitrator also is neither binding nor enforceable.  *See Peabody Holding Co., LLC v. United Mine Workers of Am.*, 665 F.3d 96, 105 (4th Cir. 2012) (questions of contract formation "cannot 'arise under' an agreement that was never validly formed").  For this reason, the district court, not the arbitrator, must decide whether the parties ever formed an agreement to arbitrate.  *See Berkeley Cnty. Sch. Dist. v. Hub Int'l. Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019); *see also Lyles v. Chegg, Inc.*, No. RDB-19-3235, 2020 WL 1985043, at *3 (D. Md. 2020) ("Even when questions of arbitrability have been delegated to the arbitrator, however, the court must decide issues concerning contract formation."); *Coady v. Nationwide Motor Sales Corp.*, No. SAG-20-1142, 2020 WL 6785352, at *3 (D. Md. Nov. 18, 2020), *aff'd by Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288 (4th Cir. 2022); *Jones v. Prosper Marketplace, Inc.*, No. GJH-21-893, 2022 WL 834210, at *10–11 (D. Md. Mar. 21, 2022).

Continental, nonetheless, offhandedly contends that because Plaintiffs challenge the "validity" of the Cardholder Agreement, as opposed to the validity of the Arbitration Provision, the question goes to the arbitrator.  *Johnson*, ECF No. 15 at 3.  But Continental confuses the concepts of contract *validity* and contract *formation*.  *See id.* at 3–4 (citing cases involving challenges to contract validity).  A challenge to an agreement's validity does not implicate whether the contract had been validly formed.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n. 1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."); *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 300 (2010).  Rather, challenges to the validity of a contract essentially presume the contract had been formed, but nonetheless should

not be enforced for any number of reasons.  *See, e.g.*, *Buckeye Check Cashing*, 546 U.S. at 443 (contract challenged as invalid for violating state law); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 399 (1967) (contract challenged as invalid because it was fraudulently induced).

Plaintiffs oppose the Arbitration Provision not because it is "invalid," but because it was never formed.  *Johnson*, ECF No. 14 at 26–30.  This challenge plainly stays with the Court, regardless of whether Plaintiffs mount a direct challenge solely to the formation of the Arbitration Provision, or a broader attack on the formation of the Agreement within which the Arbitration Provision sits.  *See* 9 U.S.C. § 4; *see also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1140 (9th Cir. 1991); *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397–98 (3d Cir. 2020) (The Court must "decide questions about the formation or existence of an arbitration agreement…even when the answer requires passing judgment on the formation or existence of the container contract.").

The Court now turns to the heart of the dispute.  Fairly presented, Plaintiffs contend that the Change Clause renders the parties' agreement to arbitrate all disputes illusory.  *Johnson*, ECF No. 14 at 26–30.  On this point, the Maryland Supreme Court decision in *Cheek v. United Healthcare of Mid-Atl., Inc.*, 378 Md. 139 (2003) is instructive.  There, the plaintiff sued his former employer for breach of contract.  On motion of the employer, the trial court dismissed the complaint and ordered that plaintiff submit to binding arbitration pursuant to the arbitration provision included in his employment agreement.  On appeal, the plaintiff argued that because the employment agreement "reserve[d]" to the employer only "the right to alter, amend, modify or revoke" the arbitration agreement "at any time with or without notice," the arbitration provision was illusory and thus unenforceable.  *Id.* at 142–45.

The Maryland Supreme Court agreed. The Court explained that agreements to arbitrate are creatures of contract, and so the parties' "[f]orebearance to exercise a right or pursue a claim" in a court of law amounts to sufficient consideration. *Id.* at 148 (quoting *Chernick v. Chernick*, 327 Md. 470, 480 (1992)). The Court next reasoned that because the arbitration provision in the employment agreement allowed the employer to revoke any terms of its promise to arbitrate at any time and without notice, the agreement created no real binding promises. *Id.* at 149. Thus, the promise to arbitrate was illusory. *Id.*

Plaintiffs analogize the Change Clause as applied to the Arbitration Provision to that in *Cheek*, urging the Court to reach the same conclusion. *Johnson*, ECF No. 14 at 26–30. The Court agrees that in all material respects, the Change Clause works the same as in *Cheek*. It allows Continental to alter at will any part of the Agreement, including the Arbitration Provision, such that the original bargained-for promises mean nothing. *Johnson*, ECF No. 13-5 at 5. Thus, as in *Cheek*, without any such consideration, no agreement to arbitrate was formed.

In response, Continental first asserts that the Change Clause does not apply to the Arbitration Provision because, unlike in *Cheek*, the Change Clause sits outside the four corners of the Arbitration Provision itself. *Johnson*, ECF No. 15 at 6 ("The 'Changes in Agreement' terms were only included in the underlying contract. They were not included in the Arbitration Provision specifically."). To be sure, the Court must consider "the language of the arbitration agreement" to ascertain whether the promise to arbitrate is supported by sufficient consideration. *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (citing *Cheek*, 378 Md. at 153–54); *Coady*, 32 F.4th at 291–92. Under the severability principle, the Court must read, where possible, the promise to arbitrate as separate from the larger contract, and not look outside the arbitration provision "to determine whether consideration exists to support an agreement to

9

arbitrate." *Coady*, 32 F.4th at 291 (quoting *Cheek*, 378 Md. at 154); *see also Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 609 (4th Cir. 2013) ("Under Maryland law as articulated in *Cheek*, an arbitration provision must be supported by consideration independent of the contract underlying it, namely, mutual obligation.").

But the severability principle does not command that the Court ignore the plain reading of the "contract as a whole" to determine which contract terms are part of the agreement to arbitrate. *Coady*, 32 F.4th at 291 (quoting *Schneider Elec. Bldgs. Critical Sys., Inc., v. W. Sur. Co.,* 454 Md. 698, 707 (2017)); *see also Jones*, 2022 WL 834210, at *15 (considering an arbitration provision in conjunction with the contract within which it was situated); *Caire*, 982 F. Supp. 2d at 594 (D. Md. 2013) (same); *cf. Hill*, 412 F.3d at 543–44 (declining to look outside of an arbitration agreement that was a standalone document, rather than a clause within a broader contract). Contract terms must be given their "customary, ordinary meaning" throughout the entirety of the contract. *Fister ex rel. Estate of Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210 (2001) (quoting *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305 (2000)). Doing so here means that the Change Clause applies to, and is part of, the Arbitration Provision.

The Court begins with the structure of the Agreement. By its own terms, it is a single agreement that includes within it a provision to arbitrate disputes. *Johnson*, ECF No. 13-5. Consistent with this structure, the Agreement defines an array of terms used throughout the Agreement, to include within the Arbitration Provision. *Id.* at 4. Basic party identifiers—such as "you" and "we"—are defined outside the confines of the Arbitration Provision but are incorporated by reference. The same can be said for more substantive provisions like the "Applicable Law." *Id.* at 4–5, 12–13. Stated otherwise, general terms to be used throughout "the Agreement" are applied to and used in the Arbitration Provision.

The Change Clause operates no differently. Situated with the other definitional terms governing the Agreement, the clause announces that Continental may "change any term of *this Agreement*…upon such notice to you as is required by law." *Id.* at 5 (emphasis added). Further, the Arbitration Provision is plainly part of "this Agreement," as reflected by its use of definitions and terms defined elsewhere in the Agreement. Thus, the Change Clause also applies to, and is a part of, the Arbitration Provision.

Indeed, this reading is consistent with Continental's own course of conduct. After the named Plaintiffs had accepted the Agreement but before filing suit, Continental eliminated from the Arbitration Provision its promise to advance arbitration fees for the cardholder. *See Johnson*, ECF No. 14-2 at 11. Further, Continental made this change without notice to, or consent from, the Plaintiffs; as Continental itself admits, it only posted the updated Cardholder Agreement online after the fact. *Johnson*, ECF No. 15 at 10. Thus, Continental's actions reinforce the plain reading of the Change Clause as applicable to the Arbitration Provision.

Continental next argues that even if the Court reads the Change Clause as part of the Arbitration Provision, the clause is materially dissimilar to that in *Cheek*. Continental contends that because any change must be "upon such notice…as is required by law," the Change Clause operates more closely to that which the Maryland Supreme Court confronted in *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580 (2006). *Johnson*, ECF No. 15 at 8–9. *Holloman* provides Continental thin cover.

In *Holloman*, the Maryland Supreme Court was again asked to determine whether a unilateral change clause rendered the relevant agreement between the parties illusory. Unlike the change clause in *Cheek*, the clause in *Holloman* included a robust advance notice provision that defined precisely how and when the employer could change the contract's terms. The change

11

clause reads in its entirety:

> Circuit City may alter or terminate the Agreement and these Dispute Resolution Rules and Procedures on December 31 of any year upon giving 30 calendar days written notice to Associates, provided that all claims arising before alteration or termination shall be subject to the Agreement and corresponding Dispute Resolution Rules and Procedures in effect at the time the Arbitration Request Form and accompanying filing fee, or Request for Waiver of Filing Fee is received by the Company. Notice may be given by posting a written notice by December 1 of each year at all Circuit City locations (including locations of affiliated companies). A copy of the text of any modification to the Agreement or Rules and Procedures will be published in the Applicant Packet, which will be available at such locations after December 31 of each year.

*Holloman*, 391 Md. at 586.

Importantly, *Holloman* turned not merely on the inclusion of the term "notice," as Continental suggests. The court instead focused on the restrictive nature of the change provision, which confined Circuit City's ability to change the agreement to a single day in the year, preceded by 30 days' written warning. *Id.* at 392. Thus, the Court concluded that Circuit City remained "bound" to the terms of the preexisting agreement "for 364 days." *Id.* Moreover, because Circuit City was required to provide 30 days' notice of any changes, "Holloman…could have the opportunity to arbitrate any 'grievance' with Circuit City under the terms explicated during the 30-day window without fear of recission or alteration by Circuit City." *Id.* at 592–93. This, in turn, meant that the parties' initial mutual promise to arbitrate could remain in effect such that the promise itself provided adequate consideration. *Id.*

In contrast, the clause here permits unilateral changes "upon such notice to you as is required by law." But the additional terminology begs the question what *kind* of "notice," as required by what "law"? Unlike *Holloman*, the change clause does not promise *advance* notice, and so "upon such notice" could include mere notification after-the-fact. Again, Continental's conduct proves the point: *after* Continental eliminated the advancement-of-fees clause in the

12

Arbitration Provision, all it did was post on its website an updated version of the Agreement. *Johnson*, ECF Nos. 14-2 at 11; 15 at 10.  But such post-hoc "notice" renders the promise to arbitrate as illusory as it was in *Cheek*.  Whatever terms to which the parties agreed at the outset, Continental can "escape" those terms, "without suffering a detriment or giving the other party a benefit."  3 Williston on Contracts § 7:7 (4th ed. 2023); *see also Jones*, 2022 WL 834210, at *16 (mere promise to provide "notice," without promise to provide advance notice, does not constitute "a limitation on [Defendant's] ability to change terms in the same vein as *Holloman*").

Nor does the term "as is required by law" add much.  The Cardholder Agreement does not cite any law that requires such notice, nor does it articulate what is meant by the phrase "as is required by law."  And even though Continental knew how to define such terms as "Applicable Law" in the Agreement, "as is required by law" is given no similar clarity.  *Compare Johnson*, ECF No. 13-5 at 5 ("as is required by law"); *with id.* at 9 ("unless imposed by law"); *id.* at 5, 11 ("as permitted by law"); *id.* at 12 ("as may be required by law"); *id.* at 4, 7 ("in accordance with law"); *id.* at 6 ("in accordance with federal law").  At best, "as is required by law" does not appear to restrict Continental from changing the Agreement terms in any way.  For this reason, the analysis cleaves more closely to *Cheek* than *Holloman.*

Continental, for its part, tries mightily to convince the Court that "as is required by law" means Maryland judge-made law such that under *Cheek,* and so as long as the agreement requires some amorphous "notice," the Change Clause is not illusory.  *Johnson*, ECF No. 15 at 9.  This argument is unconvincing.  *Cheek* stands for the proposition that a clause allowing one party unfettered ability to change contract terms without any notice renders the agreement illusory.  *Cheek*, 378 Md. at 149.  But beyond that, *Cheek* spoke not at all as to what kind of notice suffices.  And *Holloman* confined its analysis to a far more robust notice provision than is

at issue here. Nor does Continental supply any other "law" that would restrict Continental's ability to change any Agreement term whenever or however it prefers.[3]

In sum, Continental retains unfettered and unilateral power to alter any terms of the Arbitration Provision however it wants. Plaintiffs, in turn, have received no definite promises in exchange for agreeing to submit to binding arbitration in lieu of litigation. *Cheek*, 378 Md. at 148–49. Because the arbitration agreement lacks consideration, it is illusory, and no legal basis exists to compel arbitration. Thus, Continental's motions to compel must be denied.

### III.    Motion to Strike Class Allegations

For similar reasons, Continental's motion to strike class allegations is easily disposed. Continental singularly contends that the allegations must be stricken because Plaintiffs have waived their right to "participate in class action or other consolidated proceeding" in the Arbitration Provision. *Crider*, ECF No. 9-1 at 15. But because the Arbitration Provision is illusory, this Court cannot enforce any of its terms. The motion to strike is thus denied.[4]

### IV.    Conclusion

Continental's motions to compel arbitration and strike class allegations are denied. Johnson's unopposed motion to amend the Complaint is granted. A separate Order follows.

| | |
|---|---|
| 9/7/2023 | /S/ |
| Date | Paula Xinis |
| | United States District Judge |

---

[3] In *Bailey v. Mercury Financial, LLC*, No. DKC-23-827, the parties—represented by the same lawyers as in the actions before this Court—raise near identical arguments regarding whether a different cardholder agreement's unilateral change clause renders the arbitration provision illusory. The lender in *Bailey* argues that the notice "required by law" can be found in Regulation Z (12 C.F.R. § 1026) to the Truth in Lending Act (15 U.S.C. § 1601). *Bailey*, No. DKC-23-827, ECF No. 15 at 11–12. Continental makes no similar argument here, and even if it had, Regulation Z does not seem to alter the outcome. The regulation requires only advance notice of any change to the "statement that information about consumers' right to dispute transactions is included in the account-opening disclosures"; it does not require advance notice of changes to the dispute resolution process itself. 12 C.F.R. §§ 1026.6(b)(2), 1026.9(c)(2).

[4] Johnson also moved to amend the Complaint, which Continental does not oppose. The motion is granted, and the proposed Amended Complaint at ECF No. 16-1 will be the operative complaint.